UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

SEQUIN, LLC,                                          :
     Plaintiff,                                  :
                                        :
     v.                                          :     C.A. No. 20-62WES
                                          :
KIMBERLY RENK, GREGORY C. DRYER,     :
and UNLIMITED, LLC, d/b/a SEQUIN,    :
     Defendants.                                 :

**REPORT AND RECOMMENDATION**

PATRICIA A. SULLIVAN, United States Magistrate Judge.

"Happy families are all alike; every unhappy family is unhappy in its own way."
Leo Tolstoy, Anna Karenina (1877).[1]

Now pending before the Court is the motion of Defendant Kimberly Renk ("Kim")[2] to

dismiss two Counts – Count V (defamation *per se*) and Count VI (tortious interference with

business relations) – asserted against her by Plaintiff Sequin, LLC ("Sequin"), for failure to state

a claim pursuant to Fed. R. Civ. P. 12(b)(6).  ECF No. 30.  In Count V, Sequin alleges that Kim

defamed it *per se* by sending an email to some of its customers that exposed the details of a

dysfunctional family squabble between Kim and certain members of the Renk family[3] who own

and manage Sequin.  ECF No. 17 at 24-26.  In Count VI, Sequin claims that the email interfered

with its business relationships, as well as its reputation and standing with these customers.  Id. at

26-27.  The motion has been referred to me pursuant to 28 U.S.C.§ 636(b)(1)(B).  Finding that

the verified First Amended Complaint ("FAC") fails plausibly to allege either that the email is

---

[1] This version of the opening sentence of Anna Karenina is taken from the translation by Joel Carmichael.  Leo Tolstoy, Anna Karenina 1 (Bantam Classic ed. 1981).

[2] Counts V and VI are asserted only against Kim.  The other Defendants – Gregory C. Dryer, Kim's husband, and Bunnies Unlimited, LLC, Kim's business – have not joined the motion to dismiss.

[3] These Renk family members include Kim's sister, Linda Renk ("Linda"), Kim's brother, Richard John Renk, Jr. ("RJ"), and Kim's father, Richard Renk, Sr. ("Richard").

defamatory *per se* (or defamatory at all) as to Sequin or that its allegedly defamatory statements interfered (causing harm resulting in damages) with Sequin's relationships with any of its customers, I recommend that the motion be granted.

## I. SETTING THE STAGE

Kim's motion to dismiss arises in a case that is not new to this Court; therefore, before focusing on the instant motion, I pause to sketch in the somewhat complicated background.

The Court became familiar with the matter in the course of addressing Sequin's motion for preliminary injunction and Defendants' motion to stay Counts I-IV based on the abstention doctrine pursuant to <u>Colorado River Water Conservation District v. United States</u>, 424 U.S. 800 (1976) ("<u>Colorado River</u>"). This work culminated in <u>Sequin, LLC v. Renk</u>, C.A. No. 20-62WES, 2020 WL 5995205 (D.R.I. Oct. 2, 2020) ("<u>Sequin I</u>").[4] In brief, these proceedings have revealed the unpleasant details of an ugly family fight over ownership and control of Sequin, a successful New York-based seller of costume jewelry. <u>Sequin I</u>, at *2-5. Since 2018, the family war has been publicly waged in New York state court. <u>See generally</u> <u>Renk v. Renk</u>, Index No. 652439/2018 (N.Y. Sup. Ct.) ("<u>Renk v. Renk I</u>"), and <u>Renk v. Renk</u>, Index No. 153019/2020 (N.Y. Sup. Ct.) ("<u>Renk v. Renk II</u>"). The internecine strife spilled into the District of Rhode Island, when Sequin initiated this case in February 2020. In the New York cases, Kim claims that, with her sister, Linda, she co-founded Sequin in 1999 and that 50% of Sequin is rightfully hers but her interest has been held in her father's name, and that, more recently, her siblings,

---

[4] Sequin's preliminary injunction motion was abandoned after the Court questioned Sequin's counsel regarding its *bona fides*, including the troubling discrepancies between the facts reflected in the pleadings and the discovery developed in <u>Renk v. Renk</u>, Index No. 652439/2018 (N.Y. Sup. Ct.) and Linda's averments under oath in this case. <u>Sequin I</u>, at *3 n.8, *12. Defendants' <u>Colorado River</u> motion to stay Sequin's infringement claims was granted. <u>Sequin I</u>, at *13.

Linda and RJ, have wrongly forced her out of Sequin.  As described by the New York Supreme

Court in Renk v. Renk I:

> [A]lthough [Kim] has served in a well-compensated managerial position at Sequin
> [since leaving her prior employment, Kim's] father never formally transferred the
> 50% interest to her or placed it in her name. . . .   Linda . . . claims the second 50%
> interest was in the name of their father Richard and that any promise Richard may
> have made to transfer his interest to [Kim] is unenforceable.  [Kim] commenced
> this suit after a break down in her relationship with Linda . . . as part of an internal
> family power struggle related to the running of the company.

Renk v. Renk I, No. 652439/2018, 2020 WL 2572384, at *1 (N.Y. Sup. Ct. May 21, 2020)

(motion to dismiss denied in part, granted in part), aff'd, ___ N.Y.S.3d ____, 188 A.D.3d 502

(N.Y. App. Div. Nov. 12, 2020).  While Linda, RJ and Richard have conceded that Kim was

lauded as a Sequin co-founder on Sequin's website and Linda and Richard have admitted that

Kim may be entitled to an interest in Sequin beyond her status as an employee holding a "well-

compensated managerial position," they contend that Kim has engaged in significant misconduct

that has adversely affected Sequin resulting in their decision to suspend her and bring legal

claims against her; they vigorously dispute that Kim is entitled to ownership of 50% of Sequin.

Sequin I, at *2, 5.

As a public airing of the Renk family troubles, the sorry spectacle began in May 2018,

when Kim filed Renk v. Renk I in New York state court, claiming that she is entitled to a 50%

interest in Sequin.  Sequin I, at *2.  After the filing (which drew an array of counterclaims), for a

time, the battle seemed contained in that Kim continued to serve in a top managerial capacity at

Sequin and was paid "generous compensation."  FAC ¶ 52.  That changed on February 7, 2020,

with Sequin's filing of this case, in which it sued Kim in the District of Rhode Island for

infringement based on her operation of a Sequin-branded pop-up store in Newport.  Sequin I, at

*4-5.  Soon after, on March 6, 2020, Sequin suspended Kim's employment, sending a terse

3

lawyer's letter advising that "due to her ongoing and unremedied misconduct in Sequin's workplace, [Kim's] employment is suspended effective immediately."  ECF No. 29-18 at 84; see also FAC ¶ 49.  At the same time, Linda and RJ sent a reassuring communication[5] to Kohl's and other Sequin customers regarding Kim's departure, advising that Kim "will be on a leave of absence effective today," but allaying concerns: "[w]e have the same strong, talented and dedicated executive team, who are committed to continuity and uninterrupted execution of our business so there will be no change to our organization's functionality."  ECF No. 29-18 at 86. Sequin describes this communication in its brief in opposition to the motion to dismiss: "[t]hese Sequin owners and officers merely sent an innocuous notice to their customers of [Kim's] leave of absence to ensure their customers could maintain contacts with the company during her leave."  ECF No. 33 at 19.

On March 23, 2020, Kim filed Renk v. Renk II in New York state court, suing Sequin and her siblings for employment discrimination, wrongful discharge and injury to reputation. Sequin I, at *5.  The filings in Renk v. Renk II describe incendiary and unsavory behavior by, and bilious exchanges among, the siblings and their attorneys, with each side accusing the other of offensive workplace misconduct.  See generally Renk v. Renk II, Index No. 153019/2020

---

[5] The complete text of this communication is:

> Dear Kohl's Team
> We want to inform you that Kim Renk will be on a leave of absence effective today.
> We have the same strong, talented and dedicated executive team, who are committed to continuity and uninterrupted execution of our business so there will be no change to our organization's functionality.
> On behalf of everyone at Sequin, please know we appreciate and value your partnership.
> Should you have any questions or concerns, please do not hesitate to reach out to me directly.
> Thank you,
> Linda Renk & RJ Renk

ECF No. 29-18 at 86.  At the hearing, the Court confirmed that Sequin does not dispute the authenticity of this iteration of Linda's and RJ's communication to Kohl's.

(N.Y. Sup. Ct.).[6]  Kim's pleading includes the charge that Linda's and RJ's communication to

Kohl's (and others) was sent with the "specific intent of destroying whatever standing [Kim] had

with customers . . . developed over the past 20 years."  Sequin I, at *5 (internal quotation marks

omitted).  Next, on April 6, 2020, Kim sent an email to an individual ("E.E.") at Kohl's; Kim

claims that this email was in response to the Kohl's communication written by Linda and RJ.[7]

ECF No. 30-1 at 8.  This email contains the nine accused statements that Sequin alleges are

defamatory per se.  FAC ¶ 51.

The complete text of the email to E.E. (with the accused defamatory statements

underscored by the Court) is as follows:

> Sent: Monday, April 6, 2020, 03:55:48 PM EDT
> Subject: Kim Renk & Sequin
>
> Dear [E.E.],
>
> I hope this finds you and your family well and staying safe during this very scary
> corona virus world we now find ourselves in.  It is not my intent to intrude or
> disturb your focus on staying safe.  As such I've avoided sending this to you until
> now.
>
> I write because many of Sequin's clients have reached out to me after receiving an
> embarrassing and awkward communication recently sent to you by my sister,
> Linda Renk, and brother, RJ Renk, concerning my relationship with Sequin and
> falsely suggesting that I had reason to take a "leave of absence".  In response to
> your kind and heartfelt concerns about my health, which I deeply appreciate, I
> feel I must correct the record at this time:
>
> - I am not on a leave of absence;
> - I do not have the Corona virus or any other condition;
> - I'm perfectly healthy as well;
> - Contrary to Linda's assertions, it is not the same strong team at Sequin.

---

[6] Since the events pertinent to this motion, Renk v. Renk II was dismissed by the New York Supreme Court; an appeal from the dismissal is pending.  Renk v. Renk, Index No. 153019/2020, 2020 N.Y. Misc. LEXIS 10284 (N.Y. Sup. Ct. Nov. 25, 2020), appeal filed, Index No. 153019/2020, NYSCEF No. 49 (N.Y. Sup. Ct. Dec. 28, 2020).

[7] Just as Linda and RJ also sent their communication to other Sequin customers, ECF No. 33 at 19, Kim also sent her responsive email not just to E.E. and other individuals at Kohl's but also to individuals associated with other Sequin customers.  FAC ¶¶ 53-54.

Thank you for taking the time to reach out to me after receiving that communication.  Quite simply, <u>Linda and RJ are pushing me out of my company in retaliation for my taking legal action to reclaim my ownership in, Sequin</u>.  This has been an ongoing family issue that I have made every effort to avoid making public in order to amicably and discreetly resolve the matter.  However, in 2018 I was forced to file a lawsuit with the Supreme Court of New York which is publicly available under Index #625439/2018 regarding my 50% ownership in <u>Sequin, the Company I conceived, founded and built</u>.  In response, <u>Linda has orchestrated a campaign of disinformation and retaliation against me seeking to publicly undermine and diminish my role in Sequin and impugning my character and reputation as a co-founder and principal contributor to Sequin's success</u>.  <u>The retaliation and hostile atmosphere has become so toxic</u> that I had to file a lawsuit for constructive termination which is publicly available under Index #153019/2020 and I have been forced out of the company after 20 years of giving it my all to build it to the success that it is today.

As many of you know, prior to co-founding Sequin with my sister in 1999, I had worked for 20 years in fashion jewelry first at Napier Jewelry and then for 17 years I had the unique opportunity of being the Vice President and Co-Head of Product Development in Swank, Inc.'s women's division.  During that time, I launched Guess Jewelry with Paul Marciano, Kenneth Cole Jewelry with Kenneth Cole and DKNY Jewelry with Donna Karan among many other major national brands.

What you may not know was at the time of Sequin's formation, I was transitioning over from Swank which was in the process of selling its women's jewelry division.  Meanwhile, Linda who had been a swimwear and sweater buyer at Target, was terminated by Target.  While Linda never had any jewelry or accessories experience of any sort, she was my best friend and sister and I wanted her to be my equal partner to help launch my plan and vision.  It seemed a good idea to come together as sisters where our plan was to each pursue business lines based on our respective careers, Linda would run a shawl and beaded bag business and I would start a costume jewelry business.  As a financial backer withdrew, and while I was charting the course for our soon to launch company, my Father was given the Business Plan that my husband and I created for starting a jewelry company.  To avoid potential complications for Sequin and for me at Swank, he told me he would hold my 50% ownership in Sequin in trust for me until I came over from Swank.  Trusting my Father who is also a lawyer, I went along with his direction. I came over from Swank a few months after Sequin's launch.  I immediately focused on building the business and bringing my whole range of contacts to Sequin which included employees, customers and major Asian suppliers.  With some money from my Father and a lot of sweat equity, Linda and I went forward on developing our business lines.  When Linda's beaded bag business quickly flopped, I invited her to help me in the jewelry business.

6

Without belaboring the issue, I trusted my family and relied on their assurances that my membership interests held by my father would be transferred to me when requested.  However, he has failed to do so as he has done since 2010 when I first involved lawyers to peacefully resolve the matter.  With each passing year it seemed like the matter would be resolved peacefully and quietly.  Ten years later, he still refuses even after I commenced the legal action referred to above in 2018.  My Father and Linda are instead trying to steal my 50% ownership in Sequin.

I'm very proud of <u>Sequin, the company I founded and built into an incredibly successful fashion jewelry business</u>.

Now you understand why I am reaching out to you in this difficult time to respond to the false communication sent by Linda and RJ.  <u>I cannot control their efforts to demean me and smear my reputation in the industry</u>.  However, I will not idly sit by in the face of such efforts to damage my reputation and my relationship with you. Those relationships are the pride of my business career.  But for my Father's refusal to transfer to me what is rightfully mine, I would never have to bring any of this un-tawdry in-family fighting to your attention.  However, <u>it is necessary given that Linda and RJ have set out to intentionally deceive you as to what is really going on and the circumstances of my coerced departure</u>.

As <u>I, for the time being, am not working with Sequin, a reality that sadly damages my company</u>, I nonetheless wanted to thank you for all that we were able to build together over the years.  I trust that you will fondly reflect upon the many years of our personal and business relationship.

Be well and I pray each of you and your families remain healthy and safe.

All the Best,

Kim

ECF 30-3; <u>see also</u> FAC ¶ 51.  Appended to the email, Kim included copies of the complaints in

both <u>Renk v. Renk I</u> and <u>Renk v. Renk II</u>.  ECF 30-3 at 4-58.  Also attached to the email is a one-

page image characterized by Kim as a "publicity release from 2014," ECF No. 30-1 at 10, which

appears to be a copy of page 26 from a publication entitled "Modern Luxury Palm Beach"

available at "mlpalmbeach.com"; its brief text (attributed to "Carolina Buia") describes Kim and

Linda as "the co-owners and co-founders of Sequin."  ECF No. 30-3 at 59.

A week after the accused email was sent, on April 13, 2020, Kim filed her Rhode Island motion to dismiss based on Colorado River.  ECF No. 15.  Two weeks later, on April 27, 2020, Sequin fired back with the FAC, mooting the Colorado River motion to dismiss.  ECF No. 17; May 5, 2020 Text Order.  Targeting the accused email, the FAC added the two new claims that are the subject of the instant motion, Counts V (defamation *per se*) and VI (tortious interference with business relations).  FAC at 24-27.  Kim responded to the FAC by seeking to stay the infringement claims (Counts I-IV) based on Colorado River, while moving to dismiss the new defamation and tortious interference Counts for failing to state a claim.  ECF Nos. 29 & 30.  The Court resolved the former motion in Sequin I; the latter motion is now the subject of this report and recommendation.

## II.    STANDARD OF REVIEW

To avoid foundering in the face of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a pleading must allege a plausible entitlement to relief.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  The plausibility inquiry requires the court to distinguish "the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."  Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012).  Plausibility "means something more than merely possible, and gauging . . . plausibility is a context specific job that compels [the Court] to draw on [its] judicial experience and common sense."  Zenon v. Guzman, 924 F.3d 611, 616 (1st Cir. 2019) (internal quotation marks omitted).  The Court must determine whether the well-pled facts, taken as true, are sufficient to support "the reasonable inference that the defendant is liable for the misconduct alleged."  Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (quoting Iqbal, 556 U.S. at 678); see McKee v. Cosby, 874 F.3d 54, 59 (1st Cir. 2017) (on motion to

dismiss defamation suit, court draws all reasonable inferences in favor of non-moving party).  In making this assessment, the Court should ignore conclusory statements that do not rest on pleaded facts; thus, if an allegation is made on "information and belief," but the pleader fails to supply facts to support it, the allegation may be disregarded.  Menard v. CSX Transp., Inc., 698 F.3d 40, 44-45 & n.5 (1st Cir. 2012).  "This is so not only of legal boilerplate (e.g., "conspiracy," "willfully") but also of assertions nominally cast in factual terms but so general and conclusory as to amount merely to an assertion that unspecified facts exist to conform to the legal blueprint." Id. at 45.

Generally, a motion to dismiss under Fed. R. Civ. P. 12(b)(6) restricts the court to consideration only of the facts and authenticated versions of documents that are referenced in or attached to the challenged pleading.  Giragosian v. Bettencourt, 614 F.3d 25, 27-28 (1st Cir. 2010).  In addition, the Court may consider the entirety of any undisputedly authentic document that is integral to the complaint, even though not referenced in or attached to the pleading. Clorox Co. P.R. v. Proctor & Gamble Commercial Co., 228 F.3d 24, 32 (1st Cir. 2000); see Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) (when complaint's factual allegations are expressly linked to and dependent upon document whose authenticity is not challenged, it merges into pleading and court can review it).  However, if a document containing allegedly libelous content is considered because it is authentic and integral to the claim, its substance is not to be taken as true for purposes of the Fed. R. Civ. P. 12(b)(6) analysis.  Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 167 (4th Cir. 2016).  Otherwise, "a libel plaintiff would plead himself out of court simply by attaching the libelous writing to his complaint."  Id.; see Gant v. Wallingford Bd. of Educ., 69 F.3d 669, 674 (2d Cir. 1995) (libel plaintiff may attach accused writing without fear court will deem it true).

At the Fed. R. Civ. P. 12(b)(6) phase, the Court may also consider matters of which it may take judicial notice, as well as concessions in the plaintiff's response to the motion to dismiss.  Arturet-Velez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 13 n.2 (1st Cir. 2005).  However, while documents from prior proceedings and the procedural history in the instant case may be the subject of judicial notice, such material may be considered only "to establish the fact of such litigation and related filings" and "not for the truth of the matters asserted."  Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991); Little Kids, Inc. v. 18th Avenue Toys, Ltd., C.A. No. 18-533WES, 2020 WL 7264267, at *13 (D.R.I. Dec. 10, 2020) (taking judicial notice of procedural travel of case).  Similarly, the Court's prior decision in this case (Sequin I) has not yet ripened into the law of the case; therefore, the findings on which it is based may not be taken as settled and should not be considered in connection with a Fed. R. Civ. P. 12(b)(6) motion. See P.R. Tel. Co. v. San Juan Cable Co. LLC, 196 F. Supp. 3d 207, 231-32 (D.P.R. 2016), aff'd sub nom., P.R. Tel. Co. v. San Juan Cable LLC, 874 F.3d 767 (1st Cir. 2017).

Otherwise, if matters outside the complaint are considered, the motion must be converted to one for summary judgment.  Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009).

## III.   FAC ALLEGATIONS IN COUNTS V AND VI

For this factual summary, the Court has put on its Fed. R. Civ. P. 12(b)(6) blinders.  That is, what follows is *strictly* limited to the FAC, with its well-plead factual allegations stated as true as the Rule requires.

Sequin is a New York City-based jewelry studio founded in 1999 "by the Renk family and owned by Richard Renk, Sr., and his daughter, Linda Renk, and his son, Richard Renk, Jr." FAC ¶ 15; see also ¶ 52 ("Sequin was founded by the Renk family as a whole.").  Kim is a Renk

family member who is a "disgruntled employee . . . not satisfied with the generous salary she received" and "who believes she is entitled to more than she is." Id. ¶¶ 1, 29.  "Adding insult to injury," Kim "initiated an action in New York Supreme Court against her father, sister and brother, the owners of Sequin, falsely claiming she is entitled to an unjustified ownership interest in Sequin." Id. ¶ 1.  On February 7, 2020, Sequin filed its Rhode Island infringement complaint against Kim, as well as its motion for preliminary injunction, and on March 6, 2020, Sequin suspended Kim's employment "as a result of 'her ongoing and unremedied misconduct in Sequin's workplace,'" while continuing "her generous compensation" (including an apartment and a driver); Kim subsequently resigned.  Id. ¶¶ 3, 8, 49.  In response to Sequin's filing of the Rhode Island action and her suspension, on April 6, 2020, Kim contacted Kohl's and other Sequin's customers by email, "falsely" claiming: that she "conceived, founded and built Sequin and is the reason for its success"; that the atmosphere at Sequin was "'hostile' and 'toxic'"; that she was pushed out of Sequin in retaliation for the filing of the New York Supreme Court action; that Sequin and its owners are "intentionally deceiv[ing]" their clients; that "it is not the same strong team at Sequin"; and that the company is "damaged" without her.  Id. ¶¶ 4, 50-54.

In support of Counts V and VI, Sequin relies on nine specific accused statements drawn from Kim's April 6, 2020, email, which was published "to the merchandising department at Kohl's, Sequin's biggest customer" and to the merchandising departments of two other "major customers" of Sequin (Express, Inc. and Lilly Pulitzer, Inc.).  Id. ¶¶ 51, 54.  The nine statements are as follows:

1.   "[I]t is not the same strong team at Sequin[.]"

2.   "Linda and RJ are pushing me out of my company in retaliation for my taking legal action to reclaim my ownership in, Sequin[.]"

3.   "Sequin, the Company I conceived, founded and built[.]"

4.   "Linda has orchestrated a campaign of disinformation and retaliation against me seeking to publicly undermine and diminish my role in Sequin and impugning my character and reputation as a co-founder and principal contributor to Sequin's success[.]"

5.   "The retaliation and hostile atmosphere has become so toxic" at Sequin.

6.   "Sequin, the company I founded and built into an incredibly successful fashion jewelry business[.]"

7.   "I cannot control [Linda's and RJ's] efforts to demean me and smear my reputation in the industry[.]"

8.   "[I]t is necessary given that Linda and RJ have set out to intentionally deceive you as to what is really going on and the circumstances of my coerced departure[.]"

9.   I, for the time being, am not working with Sequin, a reality that sadly damages my company[.]"

Id. ¶ 51.  To support the claim that these statements are defamatory *per se*, the FAC posits that Kim was "not the sole founder of Sequin nor the reason for its success. . . . [Kim] is not even an owner of Sequin."  Id. ¶ 52.  The FAC charges that the email falsely "accuses Sequin and its owners of serious violations of their professional duties in a manner that is obviously incompatible with the proper conduct of their business, trade or office and thus is defamatory *per se*," and "expose[s] Sequin to contempt or aversion or induce[s] an unsavory opinion of Sequin in the minds of its customers," damaging Sequin's relationships with its customers and resulting in the "reasonable expectation of loss of current and/or future clients."  Id. ¶¶ 53-54, 57, 87, 91-97.  As a result of the statements, Sequin claims to have suffered unspecified "substantial damages."  Id. ¶ 97.

In addition to defamation *per se*, Sequin alleges that Kim tortiously interfered with its business relationships.  FAC ¶¶ 98-106.  Based on the same nine statements, the FAC alleges that Sequin's customer "relationships have been damaged by the doubt that [Kim's] interference

has sewn [sic] . . . about the professional and ethical conduct of Sequin's business."  FAC ¶ 100.

In conclusory fashion, Sequin claims that the accused statements have caused "non-economic

damages, such as damage to its business reputation and standing with its customers" and,

therefore, it has suffered damages.  Id. ¶¶ 105-06.

## IV.   LAW AND ANALYSIS

### A.   Count V – Defamation *Per Se*

#### 1.   Rhode Island Law of Defamation *Per Se*

Pursuant to the Rhode Island common law,[8] a defamation plaintiff must prove: "(a) a

false and defamatory statement concerning another; (b) an unprivileged publication to a third

party; (c) fault amounting at least to negligence on the part of the publisher; and (d) damages,

unless the statement is actionable irrespective of special harm."  Healey v. New England

Newspapers, Inc., 555 A.2d 321, 324 (R.I. 1989) (internal quotation marks omitted).  Such a

plaintiff must show that the statement is false and malicious, imputing "conduct which

injuriously affects a man['s] reputation, or which tends to degrade him in society or bring him

into public hatred and contempt."  Burke v. Gregg, 55 A.3d 212, 218 (R.I. 2012).  The "of and

concerning" element of defamation is satisfied if the statement leads "the listener to conclude

that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or

is misnamed."  Budget Termite & Pest Control, Inc. v. Bousquet, 811 A.2d 1169, 1172 (R.I.

2002) (internal quotation marks omitted); see also Sztulman M.D. v. Donabedian, No. PB 09-

6897, 2015 WL 4590840, at *5 n.2 (R.I. Super. Ct. July 24, 2015) (of and concerning element of

defamation "is satisfied when [an] ordinary [individual] would have reasonably understood [the]

---

[8] The parties agree that Rhode Island common law applies.  ECF Nos. 30-1 at 7-11, 19-22; 33 at 9-20 (applying Rhode Island common law to defamation and tortious interference claims).  In such circumstance, the Court is free to "forgo independent analysis and accept the parties' agreement."  Borden v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991).

statement [to be] about the particular plaintiff even if never referenced by name").  Whether a communication is defamatory is a question of law for the court.  Burke, 55 A.3d 218.  Truth is an absolute defense.  Lundgren v. Pawtucket Firefighters Ass'n Local 1261, 595 A.2d 808 (R.I. 1991).

The Rhode Island Supreme Court has emphasized that defamation, with its limitation on speech, requires the claimant to carry a substantial burden.  Burke, 55 A.3d at 219-20.  As a result, "cases holding that a particular comment is defamatory are few and far between."  Id. at 220.  To illustrate, Burke cites with approval cases from around the country, id., where the speech was found to be offensive and egregious, yet not defamatory.  E.g., Fram v. Yellow Cab Co., 380 F. Supp. 1314, 1329 (W.D. Pa. 1974) (words "paranoid" and "schizophrenic" not defamatory); Blomberg v. Cox Enters., Inc., 491 S.E.2d 430, 433 (Ga. Ct. App. 1997) (statement that plaintiff is "a silver-tongued devil" not defamatory); Pace v. Rebore, 485 N.Y.S.2d 291, 293 (N.Y. App. Div. 1985) (statement that plaintiffs used "political clout" to obtain tax exemption not defamatory).

When a defamation plaintiff does not allege special or actual pecuniary damages, its claim must meet the higher bar of *per se* defamation to be viable.  Nassa v. Hook-SupeRx, Inc., 790 A.2d 368, 374 (R.I. 2002); cf. F.A.A. v. Cooper, 566 U.S. 284, 296 (2012) ("victims of libel *per quod* or slander, are barred from any recovery unless they can first show actual – that is, pecuniary or material – harm").  For defamation *per se*, damages are presumed because the "statements are so egregious and reputation shattering that there can be no question that the defamed party's reputation suffered as a result."  Ira Green, Inc. v. Military Sales & Serv. Co., C.A. No. 10-207-M, 2014 WL 12782199, at *6 (D.R.I. Jan. 15, 2014), aff'd, 775 F.3d 12 (1st Cir. 2014).

To be actionable as defamation *per se*, the false statement must impute to the claimant: "(1) a 'criminal offense,' (2) a 'loathsome disease,' (3) a 'matter incompatible with his business, trade, profession, or office,' or (4) a 'serious sexual misconduct.'" Marcil v. Kells, 936 A.2d 208, 212 (R.I. 2007) (quoting Restatement (Second) Torts § 570 at 186 (1977)).  For defamation *per se* affecting a business, the general rule is that where the publication "imputes insolvency, financial embarrassment, unworthiness of credit, or failure in business to a plaintiff, it is libelous *per se*." Andoscia v. Coady, 99 R.I. 731, 736, 210 A.2d 581, 584 (1965); accord Swerdlick v. Koch, 721 A.2d 849, 861 (R.I. 1998) (for statements to qualify as libel *per se*, publication must impute insolvency, financial embarrassment, unworthiness of credit, or failure in business).  That is, "it is essential that such imputation relate to or affect the plaintiff in his business," Swerdlick, 721 A.2d at 861 (quoting Adoscia, 99 R.I. at 736, 210 A.2d at 584), in some way that is peculiarly harmful to one engaged in that trade or profession; disparagement of a general character that is equally discreditable to all persons is not enough.  Marcil, 936 A.2d at 213; see Nassa, 790 A.2d at 374 (statements disparaging business person's "reputation for honesty in his business dealings," if false, "would be slander *per se*").  A business entity is not defamed by communications that may be defamatory to its officers and agents unless the communication also reflects discredit on the method by which the entity itself conducts business.  Restatement (Second) of Torts § 561(a) & cmt. (b) (1977); see Jankovic v. Int'l Crisis Grp., 494 F.3d 1080, 1089 (D.D.C. 2007) (generally, statement that refers to individual member of organization does not implicate organization); N. Shore Pharm. Servs., Inc. v. Breslin Assocs. Consulting LLC, 491 F. Supp. 2d 111, 128 (D. Mass. 2007) (because entity was "one man operation" and criticism of business competence and ethics of its only officer and principal employee discredited both him and entity, evidence sufficient to allow jury to determine whether statements were

15

defamatory to entity); VECC, Inc. v. Bank of N.S., 296 F. Supp. 2d 617, 623 & n.4 (D.V.I. 2003) (defamation claim by entity based on statement regarding its officer may proceed because pleading established that statement implicated creditworthiness of entity, was published to bank at which entity was seeking to open account and resulted in the closure of entity's account).

"Words alleged to be defamatory must be read in the context of the publication in which they appear, taken as a whole." Lyons v. R.I. Pub. Emps. Council 94, 516 A.2d 1339, 1343 (R.I. 1986). The accused publication must be considered in its totality, with the verbiage construed in its plain and ordinary sense from the point of view of an ordinary reader. See Burke, 55 A.3d at 219 (where gist of article with erroneous statement permits "an impression of an event that is mean-spirited," and has "inescapably critical tone," comments are still not defamatory because they could not "reasonably be interpreted to have injuriously affected [plaintiff's] reputation, degraded him in society, or brought him into public hatred and contempt"). The court's analysis should begin with the message as a whole, looking at the "gist" or "sting" of the communication, McKee, 874 F.3d at 59, 62, and must focus on all the words used, "not merely a particular phrase or sentence." Froess v. Bulman, 610 F. Supp. 332, 340 (D.R.I. 1984) (internal quotation marks omitted), aff'd, 767 F.2d 905 (1st Cir. 1985). The allegedly defamatory words should not be read in isolation. Burke, 55 A.3d at 218-19 (citing Marcil, 936 A.2d at 213).

A defamatory publication that consists of a statement in the form of opinion is "actionable if and only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Alves v. Hometown Newspapers, Inc., 857 A.2d 743, 751 (R.I. 2004) (quoting Healey, 555 A.2d at 324). If the facts underlying an expressed derogatory opinion are publicly known or disclosed, the opinion is privileged as a matter of law. Id. That is, if "readers will understand they are getting the author's interpretation of the facts presented; they are therefore

unlikely to construe the statement as insinuating the existence of additional, undisclosed [defamatory] facts." Beattie v. Fleet Nat. Bank, 746 A.2d 717, 721 (R.I. 2000) (internal quotation marks omitted); see McKee, 874 F.3d at 61 (applying Michigan law, "when the speaker outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusion, those statements are generally protected by the First Amendment") (internal quotation marks omitted).

A court may determine, as a matter of law, whether a statement is a pure opinion or a verifiable fact by examining "the totality of the circumstances in which the specific challenged statements were made, including the general tenor and context of the conversation." Piccone v. Bartels, 785 F.3d 766, 772 (1st Cir. 2015). When a statement is an opinion based on disclosed non-defamatory facts, however dishonest the statement may be, Rhode Island law requires that it must be afforded the highest form of protection under the First Amendment. Cullen v. Auclair, 809 A.2d 1107, 1110-11 (R.I. 2002) (quoting John Stuart Mill, *On Liberty* 33 (Gryphon eds. 1992): "If all mankind minus one, were of one opinion, and only one person were of contrary opinion, mankind would be no more justified in silencing that one person, than he, if he had the power, would be justified in silencing mankind."). Thus, the statement of an opinion regarding the merit of the parties' positions in a lawsuit is not actionable as defamatory. Alzheimer's Found. of Am., Inc. v. Alzheimer's Disease & Related Disorders Ass'n, Inc., 796 F. Supp. 2d 458, 471 (S.D.N.Y. 2011).

Statements about lawsuits may also implicate the privilege that the Rhode Island Supreme Court has recognized for certain communications in connection with judicial proceedings. Vieira v. Meredith, 84 R.I. 299, 301, 123 A.2d 743, 744 (1956) ("libelous matter in

17

pleadings filed in judicial proceedings are absolutely privileged where the statements are material, pertinent or relevant to the issues therein"); see Francis v. Gallo, 59 A.3d 69, 71 (R.I. 2013) ("statements made in judicial proceedings are privileged") (internal quotation marks omitted); Ims v. Town of Portsmouth, 32 A.3d 914, 927 (R.I. 2011) (statements made "in the context of [or in connection with] a judicial proceeding" are immune). Relatedly, the Rhode Island Supreme Court has adopted the "common-law privilege of fair report [that] protects the publication of fair and accurate reports of . . . judicial proceedings, even when an individual is defamed during the proceeding." Trainor v. Standard Times, 924 A.2d 766, 771 (R.I. 2007) (internal quotation marks omitted). In light of the interplay among these privileges and the principle that the statement of an opinion is not defamatory, as applied for example pursuant to New York law, a letter that advised donors of the existence of a lawsuit involving two non-profit entities, as well as that stated the author's opinion of the merits of the parties' positions, was found not to be actionable; the libel claim was dismissed. Alzheimer's Found. of Am., Inc., 796 F. Supp. 2d at 471 (letter advising donors about lawsuit is both "mere opinion and is not defamatory" and is privileged from liability as the "fair and accurate report of a judicial proceeding").

2.     Analysis of Viability of Sequin's Claim of Defamation *Per Se*

The Court's first task is to address Sequin's attempt (in its brief in opposition to the motion, ECF No. 33 at 24) to back-pedal from the text of its pleading, which clearly alleges only defamation *per se*. Doubtless alerted by Kim's motion to the reality that Rhode Island has set a high bar for defamation *per se*, Sequin now contends that the Court should treat its conclusory and speculative allegation in paragraph 97 in the FAC as an adequate factual assertion of actual economic harm that establishes special damages. The text of paragraph 97, however, belies the

argument; it states only that "Sequin has suffered, and continues to suffer substantial damages, including without limitation, the reasonable expectation loss of current and/or future clients." FAC ¶ 97.  This paragraph is devoid of any facts permitting the inference that Sequin has actually lost business because of the accused statements.  It is precisely the quality of pleading – a boilerplate allusion to unspecified facts in conformity to a legal blueprint – that Twombly/Iqbal instructs is not enough for plausibility.  See Menard, 698 F.3d at 44-45; cf. Ims, 32 A.3d at 927 (under Rhode Island law, "damage to one's reputation does not qualify as the special injury to support a claim for malicious prosecution").  Sequin has sued Kim for defamation *per se*.  The Court declines to analyze the pleading as if actual "special or pecuniary damages" had been plausibly plead.  See generally Nassa, 790 A.2d at 374.

The second threshold matter that the Court must address is what the Court may consider in connection with Sequin's Fed. R. Civ. P. 12(b)(6) motion, beyond what is in the FAC.  First, it is clear that the Court can and should consider the entirety of the accused email (with its three attachments); it is unambiguously referenced in the FAC; it is integral to the claim; and the parties agree that the version proffered by Kim (ECF No. 30-3) is authentic and should be considered.  See Clorox Co. P.R., 228 F.3d at 32.  The Court also may take judicial notice of the fact of the filing of Renk v. Renk I and Renk v. Renk II, the content (but not the truth) of the filings in those cases, as well as the procedural history in this case.  See Kramer, 937 F.2d at 774; Little Kids, 2020 WL 7264267, at *13.

The other document with which the Court has struggled is the communication to Kohl's (n.5 *supra*) written by Linda and RJ purportedly as an "innocuous notice to their customers of [Kim's] leave of absence."  ECF No. 33 at 19.  In the briefing of this motion to dismiss, Kim alleged, and Sequin admitted, that Kim wrote the accused email "[i]n response" to Linda's and

RJ's Kohl's communication, making it integral to Sequin's defamation claim.  ECF No. 30-1 at

8; ECF No. 33 at 19.  Consistently, the accused email states that it was written because

> [M]any of Sequin's clients have reached out to me after receiving an
> embarrassing and awkward communication recently sent to you by my sister,
> Linda Renk, and brother, RJ Renk, concerning my relationship with Sequin and
> falsely suggesting that I had reason to take a "leave of absence".

ECF No. 30-3 at 2.  At the hearing, Sequin confirmed that the copy of this communication which

Kim placed in the record is authentic.  The problem is that the FAC tells a story that is different

from the factual sequence that Sequin acknowledged in its brief.  The pleading specifically

alleges that Kim wrote the accused email "in response to [the District of Rhode Island complaint

and the motion for preliminary injunction] and the suspension of her employment [with

Sequin]."  FAC ¶ 4.  Contrary to Sequin's representations to this Court, the FAC (which was

verified by Linda under oath)[9] omits that it was Sequin itself that initiated communication with

its customers to explain Kim's departure after she was suspended as an employee.  Because the

Court must treat the FAC's version of events as true, the communication sent by Linda and RJ to

Kohl's and other Sequin customers will *not* be considered in connection with this Fed. R. Civ. P.

12(b)(6) motion.[10]

　　　Turning to the merits, the Court's analysis begins by focusing on what is the message of

the accused email "as a whole, before considering individual statements [Sequin] has

challenged."  McKee, 874 F.3d at 62.  The gist or sting of the email may be briefly summarized:

---

[9] This troubling truth gap between Sequin's representations to the Court and Linda's verification echoes the Court's finding in Sequin I that the FAC verified by Linda is "replete with omission of material facts and misleading representations."  Id. at *12.  Nevertheless, this prior finding may not be considered in connection with the current Fed. R. Civ. P. 12(b)(6) motion.  P.R. Tel. Co., 196 F. Supp. 3d at 231-32.  Instead, for purposes of the pending motion, the well-pled facts in FAC are accepted as true.

[10] With the Kohl's communication falling outside of the scope of a Fed. R. Civ. P. 12(b)(6) review, the Court has not considered Kim's argument based on Ponticelli v. Mine Safety Appliance Co., 104 R.I. 549, 551-52, 247 A.2d 303, 305-06 (1968), and progeny, that the accused email is her privileged response to the Kohl's communication made for the purpose of protecting her own interest arising from her relationship with the recipient.

Kim is communicating with a person (E.E.), with whom she purports to have a "personal and business relationship" of many years' duration, to explain that, contrary to an "embarrassing and awkward" communication E.E. had been sent by Linda and RJ, Kim did not take a health-based leave of absence but rather had been forced out of Sequin by her sister and brother.  ECF No. 30-3 at 2-3.  The email states that it was written to correct the record "[i]n response to [E.E.'s] kind and heartfelt concerns about [Kim's] health."  Id. at 2.  The balance of the text of the email exposes E.E. to the Renks' "tawdry in-family fighting," including a summary of Kim's disagreements with Linda, RJ and her father over their respective contributions to Sequin.  Id. at 2-3.  Kim describes herself as a Sequin "co-founder" with her sister but also states that she is not an owner because her father failed to transfer her interest to her despite assurances that he would do so.  Id.  In addition to stating her own beliefs about what happened, Kim summarizes the contrary positions taken by Linda and RJ, attaches the pertinent complaints and supplies the Case Index numbers permitting E.E. to follow-up, including to read any material in either electronic case file that Linda, RJ or Sequin may have filed in opposition to Kim's allegations.  In the email, Kim expresses her belief that she gave her "all to build [Sequin into] the success that it is today," and that, without her, "it is not the same strong team at Sequin."  Id. at 2.  And she hyperbolically characterizes how shabbily she believes her siblings and father have treated her.[11]  These derogatory statements are all targeted at Kim's family members – a classic case of "airing [the Renks'] dirty laundry."  See generally Guilfoile v. Shields, 913 F.3d 178, 184 (1st Cir. 2019) ("airing . . . dirty laundry" may be basis for defamation and tortious interference claims brought by persons targeted).

---

[11] For example, Kim accuses her sister and brother of "orchestrating a campaign of disinformation and retaliation against [her]"; of creating a "hostile atmosphere [that became] so toxic that [she] had to file [Renk v. Renk II]"; of making "efforts to demean and smear [her] reputation"; and of setting "out to intentionally deceive [E.E.] as to what is really going on and the circumstances of [her] coerced departure."  ECF No. 30-3 at 2, 3.

As to Sequin, the gist of the email is benign, if not positive.  For example, Kim describes Sequin as having a "strong team," albeit one that is not the "same" with Kim's departure.  ECF No. 30-3 at 2.  The email refers to Sequin as an "incredibly successful fashion jewelry business," repeatedly adverting to "Sequin's success," albeit attributing that success significantly to her own contribution for reasons summarized in the email and detailed in the attached pleadings.  Id. at 2, 3.  The email closes with thanks to E.E. for what she and Kim were "able to build together over the years," and with Kim's belief that her "not working with Sequin," "for the time being," is a "reality that sadly damages my company."  Id. at 3.  The email does not say or imply that Sequin will fail or be less successful without Kim; it simply set out Kim's beliefs (with a detailed explanation of the foundation for the beliefs) that the "team" will not be the same, expressly addressing E.E. as someone Kim hopes will "fondly reflect upon the many years of [their] personal and business relationship."  Id.  Viewed from this holistic perspective, the email's gist is not defamatory *per se* (indeed, not defamatory at all) as to Sequin.

For the FAC's detailed allegations, Sequin claims that it was defamed *per se* by this email because the email falsely states or implies: "Sequin is engaged in matters incompatible with the proper conduct of its business, trade, or office; Sequin has misrepresented its business structure and ownership; Sequin is deceiving its customers; and Sequin is no longer the same company and will not be successful without [Kim]."  FAC ¶ 87.  In support of these conclusory allegations, the FAC lays out counter facts ostensibly to establish that the email is false and defamatory.  FAC ¶ 52.

Regarding Sequin's business conduct and the accusation of deceit,[12] the FAC asserts that Kim was suspended due to misconduct and that it is false to say that she was pushed out by her

---

[12] Regarding Sequin's business conduct and the accusation of deceit, the specific accused statements are:

family for taking legal action.  FAC ¶¶ 42, 52.  The problem is that the email does not try to hide that the stated reason for Kim's suspension was misconduct – to the contrary, the relevant portion of the actual text of the suspension letter is quoted in one of the attachments to the email.[13]  Relatedly, the FAC alleges that "Sequin's owners are consummate professionals and treat their customers, in addition to their employees, with the utmost care" and that Sequin has not and does not "intentionally deceive" its customers."  FAC ¶ 52.  The email is not inconsistent.  While it is scathingly critical of Linda, RJ and their father in their familial treatment of their sister/daughter, Kim, accusing them of demeaning her, smearing her reputation, retaliating against her and creating a hostile atmosphere so toxic to her that she filed Renk v. Renk II, it does not critique Sequin's owners' business ethics generally nor does it say that Sequin deceives its customers or mistreats its employees nor does it otherwise reflect discredit on the manner in which Sequin conducts its business.  See generally Restatement (Second) of Torts § 561(a) & cmt. (b).  Rather, the email charges that Linda and RJ (not Sequin) deceived E.E. solely "as to what is really going on and the circumstances of [Kim's] coerced departure."  ECF No. 30-3 at 3.  That is, in accusing her sister and brother of deceit, Kim is clear in telling E.E. that she (Kim) is upset that Linda and RJ told E.E. that Kim was taking a leave, when the reality was that Kim had been involuntarily suspended by a letter charging her with

- "The retaliation and hostile atmosphere has become so toxic" at Sequin.

- "I cannot control [Linda's and RJ's] efforts to demean me and smear my reputation in the industry[.]"

- "[I]t is necessary given that Linda and RJ have set out to intentionally deceive you as to what is really going on and the circumstances of my coerced departure[.]"

FAC ¶ 51.

[13] The suspension letter is quoted in the Renk v. Renk II complaint, which was attached to the email.  ECF No. 30-3 at 51 ¶¶ 73-74.

23

misconduct.  The email neither says nor permits the inference that Sequin is engaged in deceiving its customers.  Therefore, these statements are not actionable as to Sequin.

Regarding Sequin's structure and ownership,[14] the FAC alleges that Kim is not the "sole founder of Sequin" and that it was founded by "the Renk family as a whole."  FAC ¶ 52.  However, the email is not inconsistent in that it states that Kim was a "co-founder," explaining that Sequin was "co-found[ed] with my sister in 1999."  ECF No. 30-3 at 2, 3.  The email also describes Kim's father as having a role in Sequin's founding, while the attached pleadings describe the involvement of RJ.  Similarly, the FAC alleges that "[Kim] is not even an owner of Sequin."  FAC ¶ 52.  Again, the email is not inconsistent – Kim acknowledges that she is not an owner and describes in detail her reasons for believing that she is entitled to be an owner, including a copy of the pleading and a citation to the electronic docket of <u>Renk v. Renk I</u>, where that issue is actively being litigated.  Thus, the FAC's allegation that the email falsely states that Sequin misrepresented its business structure and ownership fails because it is simply inaccurate.

Regarding Sequin's success,[15] the FAC alleges that Kim is "certainly not . . . the reason for [Sequin's] success" and that it is "attributed to the drive, hard work, and passion of [Linda]

---

[14] Regarding whether Sequin misrepresented its ownership and structure, the specific accused statements are:

- "Linda and RJ are pushing me out of my company in retaliation for my taking legal action to reclaim my ownership in, Sequin[.]"

- "Sequin, the Company I conceived, founded and built[.]"

FAC ¶ 51.

[15] Regarding whether Sequin is successful, the specific accused statements are:

- "Linda has orchestrated a campaign of disinformation and retaliation against me seeking to publicly undermine and diminish my role in Sequin and impugning my character and reputation as a co-founder and principal contributor to Sequin's success[.]"

- "Sequin, the company I founded and built into an incredibly successful fashion jewelry business[.]"

FAC ¶ 51.

and her father and brother and the number of employees under their management."  FAC ¶ 52.
The email similarly touts Sequin's success and sets out (supported by detailed facts) the basis for
Kim's belief that she is a "principal contributor to Sequin's success."  ECF No. 30-3 at 2.  At
worst, the FAC alleges that Sequin is a success despite Kim's "misconduct," FAC ¶ 52, while the
email accuses Linda of orchestrating a campaign to diminish Kim's role at Sequin and exposes
E.E. to the Renk family disagreement with Kim claiming she is more important to Sequin's
success than Linda and Linda claiming she is more important to Sequin's success than Kim.
What is significant for Sequin's defamation claim is what Linda and Kim agree on – whoever
was responsible, Sequin was and is a success.  These statements are not defamatory as to Sequin.

Regarding whether Sequin is the "same company,"[16] the FAC alleges that Kim was an
employee receiving "generous compensation," who was "treat[ed] . . . with care and respect in
the office, industry and public at large."  FAC ¶ 52.  Then on March 6, 2020, Kim was
suspended due to misconduct; after she was suspended, she resigned from Sequin.  FAC ¶ 49.
The FAC further alleges that Sequin is a success, which is attributable to Linda, RJ, their father,
and "the number of employees under their management."  FAC ¶ 52.  Boiled down to its essence,
the FAC alleges that Kim had been an employee and part of the "strong" Sequin "team," and
then she was not; therefore, the FAC effectively concedes the truth of the email's claim that the
"team" is not the same in that Kim is no longer a part of it.  Nevertheless, Sequin argues, and the
Court agrees, that Kim's stated belief that "it is not the same strong team at Sequin" permits the
reader to understand that Kim believes that the Sequin team is not as strong without her.

---

[16] Regarding whether Sequin is the "same," the specific accused statements are:

- "[I]t is not the same strong team at Sequin[.]"

- "I, for the time being, am not working with Sequin, a reality that sadly damages my company[.]"

FAC ¶ 51.

Importantly, the email contains exhaustive detail not only regarding what Kim believes was her contribution to Sequin, but also stating the contrary positions taken by her siblings and father. Indeed, both the email's text and its attachments are explicit that other Renk family members disagree that Kim made a positive contribution, believing instead that Kim engaged in "ongoing and unremedied misconduct" while at Sequin.  ECF No. 30-3 at 51 ¶¶ 73-74.  Therefore, the email clearly contains the material to allow E.E. to examine for herself Kim's belief about the significance of her departure from Sequin, in context and mindful of the Renk family crossfire. See McKee, 874 F.3d at 64 (potentially derogatory statements published with detailed backup as to foundation for belief not actionable).  As such, these statements are opinions that are not actionable.

        At bottom, the dominant theme of the accused email is the statements by Kim of her opinions regarding the non-defamatory facts that Sequin was founded by the Renk family and that the family is now being ripped apart by toxic litigation among family members, who are attacking each other through privileged filings in judicial proceedings.  See Alzheimer's Found. of Am., Inc., 796 F. Supp. 2d at 471 (statement that opponent's legal claim in lawsuit is "baseless" is "mere opinion and is not defamatory"); Viera, 84 R.I. at 301, 123 A.2d at 744 (libelous matter in pleadings absolutely privileged).  Otherwise, Sequin's contention that the email suggests to the reader that Sequin itself generally mistreats its employees and lies to its customers is overly broad and does not accurately reflect either the language or the context of the contested statements.  See Burke v. Gregg, 55 A.3d at 219 (reviewing context of communication in totality of circumstances).  Rather, read holistically as the Rhode Island Supreme Court requires, the accused email fails to state an actionable claim of defamation on behalf of Sequin in that its allegedly false and derogatory statements of fact (as opposed to statements of belief or

26

opinion with the foundational facts disclosed) are not reasonably capable of being understood as "of and concerning" Sequin.  See Budget, 811 A.2d at 1172.  Nor does the email contain any statements of fact or permit factual inferences that – as to Sequin – are so "egregious and reputation shattering" as to amount to defamation *per se*, nor does the email accuse Sequin of engaging in "improper conduct . . . in [its] profession or business."  Ira Green, Inc., 2014 WL 12782199, at *6 (internal quotation marks omitted).

Because the FAC fails plausibly to plead defamation, never mind defamation *per se*, I recommend that Count V be dismissed for failure to state a claim; further, I do not recommend that the Court permit an amendment to the FAC in an attempt to recast Count V as a claim for mere defamation (as opposed to defamation *per se*).

### B.    Count VI – Tortious Interference with Sequin's Business Relations

#### 1.    Rhode Island Law of Tortious Interference

To state a claim of tortious interference with business relations based on Rhode Island common law,[17] Sequin must plausibly allege:

> (1) the existence of a business relationship or expectancy, (2) knowledge by the interferor of the relationship or expectancy, (3) an intentional act of interference, (4) proof that the interference caused the harm sustained, and (5) damages to the plaintiff.

Mesolella v. City of Providence, 508 A.2d 661, 669-70 (R.I. 1986).  "Malice, in the sense of spite or ill will, is not required; rather legal malice – an intent to do harm without justification – will suffice."  Id.  Sequin must show an intentional and improper act of interference.  La Gondola, Inc. v. City of Providence, 210 A.3d 1205, 1221 (R.I. 2019).

For a tortious interference claim to survive a motion to dismiss, the pleading must plausibly allege facts to support the fourth and fifth elements – that the interference caused actual

---

[17] See n.8 *supra*.

harm resulting in concrete damages.  See Emrit v. Universal Music Grp., Inc., C.A. No. 13-181-ML, 2013 WL 3730423, at *2 (D.R.I. July 12, 2013) (interference claim fails, *inter alia*, because plaintiff did not plausibly allege that interference by defendant caused the harm sustained); Ira Green, Inc. v. Military Sales & Serv. Co., C.A. No. 10-207-M, 2012 WL 2178984, at *3 (D.R.I. June 13, 2012) (because counterclaim cited specific vendor relationships impacted by interference and alleged that two vendors were lost, resulting in actual damages, motion to dismiss denied).  For example, in Burke, the Rhode Island Supreme Court considered a claim for interference with prospective contractual relations, based on the allegation that the defamatory statements interfered with "prospective business clients" by damaging the business's image in the public eye, which resulted in a loss of business.  Burke, 55 A.3d at 222.  Despite applying Rhode Island's more plaintiff-friendly Rule 12(b)(6) standard, the court, among other things, held that without any allegation of a specific causal link between the statements and even one specific lost business relationship, the pleading was purely speculative and must be dismissed. Id.; see Ims, 32 A.3d at 926 (despite proof of employment relationship, plaintiff failed to demonstrate existence of employment contract; therefore, claim for tortious interference with contractual relations failed); Fed. Auto Body Works, Inc. v. Aetna Cas. & Sur. Co., 447 A.2d 377, 380 (R.I. 1982) (vague reference to unnamed customers who failed to come to autobody repair business due to defendant's actions insufficient to prove harm caused by interference).  Consistent with Burke, courts in Rhode Island and elsewhere are generally skeptical when a plaintiff tries to recycle a failed defamation claim into a claim under a different label.  See, e.g., Mullane v. Breaking Media, Inc., 433 F. Supp. 3d 102, 113 (D. Mass. 2020) ("tortious interference claims are simply recycled versions of his defamation claim and cannot succeed"), appeals docketed, Nos. 20-1061, 20-1062, 20-1080 (1st Cir. Jan. 16, 2020); Trainor, 924 A.2d at

769 n.1 ( "many cases from other jurisdictions have held that one may not breathe life into an otherwise doomed defamation claim by re-baptizing it as a different cause of action"); <u>Henry v. Media Gen. Operations, Inc.,</u> No. PC-2014-2837, 2018 WL 1732327, at *5, 13 (R.I. Super. Ct. Apr. 4, 2018) (citing <u>Trainor</u> and dismissing false light, intentional and negligent infliction of emotional distress claims as "rebaptized" failed defamation claims).

2.   <u>Analysis of Viability of Sequin's Claim of Tortious Interference</u>

Sequin's tortious interference claim fails because of the insufficiency of its conclusory pleading of the fourth and fifth elements required by Rhode Island law.  The FAC vaguely alleges that Sequin's customer "relationships have been damaged by the doubt that [Kim's] interference has sewn [sic] . . . about the professional and ethical conduct of Sequin's business." FAC ¶ 100.  Pleading on information and belief with no reference to specific facts, Sequin claims that Kim used improper means "with respect to customers of Sequin, and has thereby caused Sequin to lose accounts, contracts, business, businesses relationships and/or revenue" as well as that, but for Kim's interference, companies would have continued to do business with Sequin. FAC ¶¶ 103-04.  In conclusory fashion, Sequin asserts that this conduct has caused "non-economic damages, such as damage to its business reputation and standing with its customers" and, therefore, it has suffered "substantial damages."  <u>Id.</u> ¶¶ 105-06.  This is unadulterated speculation.  <u>Burke</u>, 55 A.3d at 222.  With no allegation of any specific business relationship actually harmed as a result of the accused email and no allegation of actual damages, Sequin's claim falls well short of the specificity required to nudge the claim "across the line from conceivable to plausible."  <u>Cardigan Mountain Sch. v. N.H. Ins. Co.,</u> 787 F.3d 82, 88 (1st Cir. 2015) (citing <u>Twombly</u>, 550 U.S. at 556).

I recommend that Court VI be dismissed for failure to state a claim.

V.     **CONCLUSION**

For the reasons set forth above, I recommend that the Court grant Defendant Kimberly Renk's motion to dismiss Counts V-VI.  ECF No. 30.  Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
January 13, 2021